UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. _____ |
| Plaintiff, | ) | |
| | ) | VIOLATIONS: |
| v. | ) | |
| | ) | Count 1:  18 U.S.C. § 371 |
| PFIZER H.C.P. CORPORATION, | ) | (Conspiracy) |
| | ) | |
| Defendant. | ) | Count 2:  15 U.S.C. § 78dd-2(a) |
| | ) | (FCPA Anti-bribery Violation) |

## INFORMATION

The United States Department of Justice, Criminal Division, Fraud Section, charges as follows:

## GENERAL ALLEGATIONS

At all times material to this Information (unless specified otherwise):

### *The Foreign Corrupt Practices Act*

1.     The Foreign Corrupt Practices Act of 1977 (hereinafter the "FCPA"), as amended, Title 15, United States Code, Sections 78dd-1 *et seq.*, prohibited certain classes of persons and entities from corruptly making payments to foreign government officials to assist in obtaining or retaining business.  Furthermore, the FCPA required issuers to make and keep books, records, and accounts that accurately and fairly reflected transactions and disposition of the company's assets and prohibited the knowing falsification of an issuer's books, records, or accounts. 15 U.S.C. § 78m(b)(2)(A).

### *Relevant Entities and Individuals*

2.     The defendant, PFIZER H.C.P. CORPORATION ("PFIZER HCP"), was an indirect wholly owned subsidiary of Pfizer Inc. ("Pfizer") and was incorporated under the laws

of the State of New York. PFIZER HCP was a "domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1). PFIZER HCP's indirect parent company, Pfizer, was a global pharmaceutical, animal health, and consumer product company headquartered in New York, New York, and incorporated in Delaware. It issued and maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act, and its common stock traded on the New York Stock Exchange under the symbol "PFE." As such, Pfizer was required to file periodic reports with the United States Securities and Exchange Commission (the "Commission") under Section 13 of the Securities Exchange Act. Accordingly, Pfizer was an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a). During the relevant period, PFIZER HCP operated in several international markets through representative offices, including offices in Bulgaria, Croatia, and Kazakhstan, as well as through contracts with Russian distributors and employees of a representative office of PFIZER HCP's parent company in Moscow ("Pfizer Russia"). The books and records of PFIZER HCP, which included revenues from the aforementioned countries, were consolidated into the books and records of Pfizer for the purposes of preparing Pfizer's year-end financial statements, which were filed with the Commission in Washington, D.C.

3.      Croatian Official, a citizen of the Republic of Croatia, held official positions on government committees in Croatia and had influence over decisions concerning the registration and reimbursement of Pfizer products marketed and sold in the country. Croatian Official was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

4.      Kazakh Company was a Kazakh company that contracted with PFIZER HCP to provide distribution services and related services in the Republic of Kazakhstan. In light of the foregoing, Kazakh Company was an "agent of a domestic concern," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

5.     Russian Official 1, a citizen of the Russian Federation, was a medical doctor, employed by a public hospital, and had influence over the Russian government's purchase and prescription of Pfizer products marketed and sold in the country.  Russian Official 1 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

6.     Russian Official 2, a citizen of the Russian Federation, was a high-ranking government official, who held official positions on government committees in Russia, and had influence over decisions concerning the reimbursement of Pfizer products marketed and sold in the country.  Russian Official 2 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

7.     Russian Official 3, a citizen of the Russian Federation, had influence over decisions concerning the treatment algorithms involving Pfizer products marketed and sold in the country.  Russian Official 3 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

8.     Russian Company 1 was a Russian company that bid on tenders issued by Russian healthcare institutions and worked with PFIZER HCP and Pfizer Russia to fill tenders using Pfizer products.  In light of the foregoing, Russian Company 1 was an "agent of a domestic concern," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

9.     Russian Company 2 was a Russian company that provided certain services to PFIZER HCP and Pfizer Russia, including making improper payments to Russian government officials and other companies on PFIZER HCP's behalf, in order to conceal the payments.  In light of the foregoing, Russian Company 2 was an "agent of a domestic concern," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

***Background on International Pharmaceutical Sales***

10.     The manufacture, registration, distribution, sale, and prescription of pharmaceuticals were highly-regulated activities throughout the world. While there were multinational regulatory schemes, it was typical that each country established its own regulatory structure at a local, regional, and/or national level. These regulatory structures generally required the registration of pharmaceuticals and regulated labeling and advertising. Additionally, in certain countries, the government established lists of pharmaceuticals that were approved for government reimbursement or otherwise determined those pharmaceuticals that might be purchased by government institutions. Moreover, countries often regulated the interactions between pharmaceutical companies and hospitals, pharmacies, and healthcare professionals.

11.     In those countries with national healthcare systems, hospitals, clinics, and pharmacies were generally agencies or instrumentalities of foreign governments, and, thus, many of the healthcare professionals employed by these agencies and instrumentalities were foreign officials within the meaning of the FCPA.

12.     During the relevant period, for the purpose of improperly influencing foreign officials in connection with regulatory and formulary approvals, purchase decisions, prescription decisions, and customs clearance, employees of PFIZER HCP and Pfizer Russia made and authorized the making of payments of cash and the provision of other things of value both directly and through third parties. Funds for these payments were often generated by employees of PFIZER HCP and Pfizer Russia through the use of collusive vendors to create fraudulent invoices.

COUNT 1
**(Conspiracy)**

13.     Paragraphs 1 through 12 of this Information are realleged and incorporated by reference as if set out in full herein.

14.     Beginning in or around 1997 and continuing through at least in or around 2006, within the FCPA's alternative jurisdiction provision for acts outside the United States, 15 U.S.C. § 78dd-2(i), the defendant, PFIZER H.C.P. CORPORATION, did unlawfully, willfully, and knowingly conspire, confederate, and agree with persons known and unknown to the United States, to commit the following offenses against the United States:

   a.     being a domestic concern, to act corruptly in furtherance of an offer, payment, promise to pay, and authorization of the giving of anything of value to any foreign official, and any person, while knowing that all or a portion of such money or thing of value would be or had been offered, given, and promised, directly and indirectly, to foreign officials, for purposes of:  (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities in order to assist PFIZER H.C.P. CORPORATION, and others known and unknown, in obtaining and retaining business for and with, and directing business to, PFIZER H.C.P. CORPORATION, in violation of Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(i)(1); and

b.     to knowingly falsify, and cause to be falsified, books, records, and accounts that

were required, in reasonable detail, to accurately and fairly reflect the transactions

and dispositions of the assets of Pfizer Inc., an issuer within the meaning of the

FCPA, in violation of Title 15, United States Code, Section 78m(b)(2)(A).

### Purpose of the Conspiracy

15.     The purpose of the conspiracy was for PFIZER HCP and its co-conspirators to

unjustly enrich themselves and others by making concealed corrupt payments to Croatian

Official, Russian Officials 1, 2 and 3, and other foreign officials in various countries, including

Bulgaria, Croatia, Kazakhstan and Russia, in exchange for improper business advantages for

PFIZER HCP, including the approval of pharmaceutical products and increased sales of

pharmaceutical products.

### Manner and Means of the Conspiracy

16.     Among the manner and means by which PFIZER HCP would and did carry out

the conspiracy were the following:

a.     PFIZER HCP through its employees and agents agreed to make improper

payments and provide benefits (including kickbacks, cash payments, gifts,

entertainment and support for domestic and international travel) to numerous

government officials, including physicians, pharmacologists and senior

government officials, who were employed by foreign governments or

instrumentalities of foreign governments, including in Bulgaria, Croatia,

Kazakhstan, and Russia.

b.     During the relevant time period, PFIZER HCP, through its employees and agents,

corruptly authorized the payment, directly or indirectly, of at least $2,000,000 to

intermediary companies, government officials, and others, to corruptly induce the

6

prescription and purchase of Pfizer products and to obtain regulatory approvals

for Pfizer products.

c.     PFIZER HCP through its employees falsely recorded the improper transactions by

booking them in a variety of ways, including as educational or charitable support,

"Travel and Entertainment," "Convention and Trade Meetings and Conferences,"

"Distribution Freight," "Clinical Grants/Clinical Trials," "Gifts," and

"Professional Services – Non Consultant," in order to conceal the improper nature

of the transactions in the books and records of PFIZER HCP.  Those false books

and records were incorporated into the books and records of Pfizer and were

consolidated with Pfizer's year-end financial reporting, which was filed with the

Commission in Washington, D.C.

## Overt Acts

17.     In furtherance of the conspiracy and to achieve the objects thereof, the following

overt acts were committed:

### *Corrupt Payments in Bulgaria*

18.     On or about January 24, 2003, a District Manager in PFIZER HCP's

representative office in Bulgaria ("Pfizer HCP Bulgaria") sent an email to his subordinates that

discussed marketing programs and "various possibilities to stimulate the prescribers" and

instructed them to give individual doctors employed in Bulgarian public hospitals "a specific

target as to how many packs (or new patients) per month he should achieve" and then provide

support for international travel on the basis of the promises to prescribe made by the doctors.

19.     On or about October 14, 2003, a Pfizer HCP Bulgaria sales department manager

sent an electronic message to multiple sales representatives containing instructions for

submitting sponsorship requests.  The manager wrote, "[e]ach representative wanting to sponsor

someone . . . must very precisely state the grounds for recommending the sponsorship, and also what the doctor in question is expected to do or has already done (which is the better option). 'Greenfield' investment is not to be preferred, because in many cases promises are not fulfilled . . . . If you are given approval, please state the exact commitments the doctor has made or performed when filling the form."

### *Corrupt Payments in Croatia*

20.     On or about July 9, 2003, employees of PFIZER HCP's representative office in Croatia ("Pfizer HCP Croatia") caused a wire transfer of $1,200 to be made from a bank account in Belgium to an account in Austria controlled by Croatian Official, which wire transfer was part of more than $85,000 paid to Croatian Official between 1997 and 2003, and which was for a purpose described by the country manager as follows: "as [Croatian Official] is a member of the Registration Committee regarding pharmaceuticals, I do expect that all products which are to be registered, will pass the regular procedure by his assistance."

21.     On or about February 18, 2004, a Pfizer HCP Croatia sales representative drafted a memorandum reporting on her discussions with doctors at Croatian public hospitals regarding bonus agreements for purchases of a Pfizer product, which reflected an agreement with the chief doctor who promised purchases of the product in exchange for PFIZER HCP providing various things of value, including travel benefits and bonuses based on a percentage of sales.

### *Corrupt Payments in Kazakhstan*

22.     On or about May 5, 2000, PFIZER HCP entered into an exclusive distribution contract for a Pfizer product with Kazakh Company that was valued at a minimum of $500,000 believing that all or part of the value of the contract would be provided to a high-level Kazakh government official.

23.     On or about September 23, 2003, a regional supervisor responsible for PFIZER

HCP's representative office in Kazakhstan sent a memorandum to his supervisor memorializing

a conversation held in Kazakhstan, in which he indicated that the controller of Kazakh Company

was "very close to government officials," and that Kazakh Company was likely responsible for

PFIZER HCP's past problems with the registration of a Pfizer product in Kazakhstan.

### *Corrupt Payments in Russia*

24.     On or about September 8, 2003, a Pfizer Russia employee emailed colleagues that

a Russian government doctor, Russian Official 1, requested funds to attend a conference and, in

return, "has pledged to prescribe at least 20 packs of [a Pfizer product] per month, and 20 []

packs [of another Pfizer product]."

25.     On or about November 19, 2003 in an invoice cover letter, a Pfizer Russia

employee requested "payment for the (motivational) trip of [Russian Official 2] for the inclusion

of [a Pfizer product] into the list . . . of medications refundable by the state" in order to influence

Russian Official 2 to add the product to the regional formulary list.

26.     On or about April 7, 2004, a Pfizer Russia employee requested that a payment be

made to a Russian government official "who took an active part in getting [a Pfizer product] into

the bidding."

27.     On or about July 26, 2004, a Pfizer Russia employee sent an email to his

supervisors stating that Russia Company 1 had won a tender for the use of a Pfizer product, and

that Russian Company 1's costs included "10% - Motivation of Officials."

28.     On or about December  2, 2004, a Pfizer Russia employee requested sponsorship

for a local department of health employee who was assisting the chief pharmacologist of a

regional pediatric hospital, Russian Official 3, who was compiling algorithms for antibiotic

therapy and wanted "to be financially compensated" for this work.  The Pfizer Russia employee

noted that, "in return for this," the pharmacologist "will include our products in the treatment algorithms" to be used in government hospitals.

29.     On or about June 9, 2005, a Pfizer Russia employee sent an email to her supervisor stating that a cash payment had been made to an individual government doctor, which represented 5% of the value of the purchases of a Pfizer product made by a certain government hospital during the month of March 2005.

30.     On or about June 27, 2005, a Pfizer Russia employee emailed that a government doctor "should be assigned the task of stretching the amount of the purchases . . . to US $100 thousand" as an "obligation" in exchange for a trip to a conference in the Netherlands or Germany.

31.     On or about September 14, 2005, a Pfizer Russia employee emailed that an "agreement on cooperation" had been reached with a government doctor, and that Pfizer Russia's requirements were the "purchase quantities," and the government doctor's requirement was "a trip to a conference."

32.     In or around October 2005 through on or about December 8, 2005, Pfizer Russia caused payments totaling at least $69,000 to be made to Russian Company 2 with the understanding that the payments would be provided to individual Russian doctors employed in public hospitals, and that the payments represented 5% of the value of the purchases of Pfizer products in the doctors' respective government hospitals.

33.     In or around October 2005, Pfizer Russia employees discussed how a regional distributor would provide Pfizer Russia with companies that have "neutral names," to which Pfizer Russia could make improper payments that would be booked as conferences to provide benefits to government doctors.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT 2</u>
**(FCPA Anti-bribery Violation)**

34.      Paragraphs 1 through 13, and 17 to 33 of this Information are realleged and

incorporated by reference as if set out in full herein.

35.      From in or around 1997 and continuing through at least in or around 2006, within

the FCPA's alternative jurisdiction provision for acts outside the United States, 15 U.S.C.

§ 78dd-2(i), the defendant, PFIZER H.C.P. CORPORATION, being a domestic concern,

corruptly and willfully made an offer, payment, promise to pay, and authorization of the giving

of anything of value to a foreign official, and persons, and aided and abetted those persons, while

knowing that all or a portion of such money or thing of value would be or had been offered,

given, and promised, directly and indirectly, to such foreign officials, for purposes of:

(i) influencing acts and decisions of such foreign officials in their official capacity; (ii) inducing

such foreign officials to do and omit to do acts in violation of the lawful duties of such officials;

(iii) securing an improper advantage; and (iv) inducing such foreign officials to use their

influence with a foreign government and instrumentalities thereof to affect and influence acts

and decisions of such government and instrumentalities in order to assist the defendant PFIZER

H.C.P. CORPORATION, in obtaining and retaining business; to wit, in order to induce the

purchase of Pfizer products by government healthcare institutions or gain approval for the sale of

Pfizer products, defendant PFIZER H.C.P. CORPORATION made and caused to be made,

directly and indirectly through intermediary companies and the agents and employees of PFIZER

H.C.P. CORPORATION, improper payments totaling at least $2,000,000 knowing that some or

all of the money would be paid to publicly-employed government health care officials, and other

foreign government officials in foreign countries, including Bulgaria, Croatia, Russia, and

Kazakhstan, all in violation of Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(i)(1),

and Title 18, United States Code, Section 2.

JEFFREY H. KNOX
Principal Deputy Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By: _____

NATHANIEL B. EDMONDS
Assistant Chief, FCPA Unit
ANDREW GENTIN
Trial Attorney

Fraud Section, Criminal Division
U.S. Department of Justice
Ph:     202-307-0629
nathaniel.edmonds@usdoj.gov