<div align="center">

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

</div>

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | Case No.   **GR -12-169** |
| v.   ) | |
| ) | |
| PFIZER H.C.P. CORPORATION,   ) | |
| ) | |
| Defendant.   ) | |
| ) | |

<div align="center">

## DEFERRED PROSECUTION AGREEMENT

</div>

Defendant Pfizer H.C.P. Corporation ("Pfizer HCP"), by its undersigned attorneys, pursuant to authority granted by the Board of Directors of Pfizer HCP, and the United States Department of Justice, Criminal Division, Fraud Section (the "Department"), enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

<div align="center">

### Criminal Information and Acceptance of Responsibility

</div>

1.     Pfizer HCP acknowledges and agrees that the Department will file the attached two count criminal Information in the United States District Court for the District of Columbia charging a conspiracy to commit an offense against the United States, in violation of the anti-bribery and books and records provisions of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(a) and 78m(b)(2)(A). In so doing, Pfizer HCP: (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal

<div align="center">

1

</div>

Procedure 48(b); and (b) knowingly waives any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia.

2.    Pfizer HCP admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees and agents as charged in the Information, and as set forth in the Statement of Facts attached hereto as Attachment A and incorporated by reference into this Agreement, and that the allegations described in the Information and the facts described in Attachment A are true and accurate. Should the Department pursue the prosecution that is deferred by this Agreement, Pfizer HCP agrees that it will neither contest the admissibility of nor contradict the Statement of Facts in any such proceeding, including any guilty plea or sentencing proceeding.

### Term of the Agreement

3.    This Agreement is effective for a period beginning on the date on which the Information is filed and ending two (2) years and seven (7) calendar days from that date (the "Term"). However, Pfizer HCP agrees that, in the event that the Department determines, in its sole discretion, that Pfizer HCP has knowingly violated any provision of this Agreement, an extension or extensions of the term of the Agreement may be imposed by the Department, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Department's right to proceed as provided in Paragraphs 16-19 below. Any extension of the Agreement extends all terms of this Agreement for an equivalent period. Conversely, in the event the Department finds, in its sole discretion, that there exists a change in circumstances, the Term of the Agreement may be terminated early.

**Relevant Considerations**

4.     The Department enters into this Agreement based on the individual facts and

circumstances presented by this case.  The Department enters into this Agreement based,

in part, on the following factors:  (a) the extraordinary cooperation of Pfizer HCP's

parent company, Pfizer Inc., ("Pfizer"), with the Department and the U.S. Securities and

Exchange Commission ("SEC"), including thorough and responsive reporting of potential

violations, including the conduct of other companies and individuals; (b) Pfizer's initial

voluntary disclosure of potential improper payments and the timely and complete

disclosure of the facts described in Attachment A, as well as facts relating to potential

improper payments in various countries that had been identified by its compliance

program, internal audit function and global internal investigations concerning bribery and

related misconduct; (c) the early and extensive remedial efforts undertaken by Pfizer,

including the substantial and continuing improvements Pfizer has made to its global anti-

corruption compliance procedures; (d) Pfizer's agreement to maintain an anti-corruption

compliance program for all of its subsidiaries worldwide, including Pfizer HCP, to

continue in its efforts to implement enhanced compliance measures, as described in

Attachments C.1 and C.2, and to provide to the Department written reports on its

progress and experience in maintaining and enhancing its compliance policies and

procedures, as described in Attachment C.3.  The reports will likely include proprietary,

financial, confidential, and competitive business information.  Moreover, public

disclosure of the reports could discourage cooperation, impede pending or potential

government investigations and thus undermine the objectives of the reporting

requirement.  For these reasons, among others, the reports and the contents thereof are

intended to remain and shall remain non-public, except as otherwise agreed to by the

parties in writing, or except to the extent that the Department determines in its sole discretion that disclosure would be in furtherance of the Department's discharge of its duties and responsibilities or is otherwise required by law.

5.  Pfizer HCP shall continue to cooperate fully with the Department in any and all matters relating to corrupt payments and related false books and records and internal controls, subject to applicable law and regulations.  At the request of the Department, and consistent with applicable law and regulations, Pfizer HCP shall also cooperate fully with such other domestic or foreign law enforcement authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of Pfizer HCP or any of its present and former officers, directors, employees, agents, consultants, contractors, subcontractors, and subsidiaries, or any other party, in any and all matters relating to corrupt payments, related false books and records, and inadequate internal controls, and in such manner as the parties may agree.  Pfizer HCP agrees that its cooperation shall include, but is not limited to, the following:

a.  Pfizer HCP shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities and those of its present and former directors, employees, agents, consultants, contractors and subcontractors, and subsidiaries concerning all matters relating to corrupt payments and related false books and records and inadequate internal controls, about which Pfizer HCP has any knowledge or about which the Department may inquire.  This obligation of truthful disclosure includes the obligation of Pfizer HCP to provide to the Department, upon request, any document, record or other tangible evidence relating to such corrupt payments,

false books and records, or inadequate internal controls about which the Department may inquire of Pfizer HCP.

b.     Upon request of the Department, with respect to any issue relevant to its investigation of corrupt payments in connection with the operations of Pfizer HCP, related false books and records, and inadequate internal controls, Pfizer HCP shall designate knowledgeable employees, agents or attorneys to provide to the Department the information and materials described in Paragraph 5(a) above, on behalf of Pfizer HCP.  It is further understood that Pfizer HCP must at all times provide complete, truthful, and accurate information.

c.     With respect to any issue relevant to the Department's investigation of corrupt payments, related false books and records, and inadequate internal controls in connection with the operations of Pfizer HCP, or any of its present or former subsidiaries or affiliates, Pfizer HCP shall use its best efforts to make available for interviews or testimony, as requested by the Department, present or former officers, directors, employees, agents and consultants of Pfizer HCP as well as the officers, directors, employees, agents and consultants of contractors and subcontractors.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement and regulatory authorities.  Cooperation under this paragraph shall include identification of witnesses who, to the knowledge of Pfizer HCP, may have material information regarding the matters under investigation.

d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Department pursuant to this Agreement, Pfizer HCP consents to any and all disclosures, subject to applicable law and regulations, to

other governmental authorities, including United States authorities and those of a foreign government, and the MDBs, of such materials as the Department, in its sole discretion, shall deem appropriate.

### Payment of Monetary Penalty

6.    The Department and Pfizer HCP agree that application of the 2011 United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

- Offense Level.  Based upon USSG § 2C1.1, the total offense level is calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 12 |
| (b)(1) | Offense involved more than one bribe | + 2 |
| (b)(2) | Value of benefit received more than $7,000,000 | + 20 |
| | TOTAL | 34 |

- Base Fine.  Based upon USSG § 8C2.4(a)(2), the base fine is $28,500,000.

- Culpability Score.    Based upon USSG § 8C2.5, the culpability score is 4, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(2) | The organization had 1000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | + 4 |
| (g)(1) | The organization, prior to an imminent threat of disclosure or government investigation, within a reasonably prompt time after becoming aware of the offense, reported the offense, fully cooperated, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct. | - 5 |
| | TOTAL | 4 |

- Calculation of Fine Range:

  | | |
  |---|---:|
  | Base Fine | $28,500,000 |
  | Multipliers | .8 (min) / 1.6 (max) |
  | Fine Range | $22,800,000 / $45,600,000 |

7.   In addition, the Government agrees that a downward departure, pursuant to USSG § 8C4.1 is warranted for substantial assistance in the investigation or prosecution of others.

8.   Thus, taking into account all relevant factors described in paragraphs 4 to 7, the Government and Pfizer HCP agree that $15,000,000 is the appropriate monetary penalty, which is a 34% reduction off the bottom of the recommended Guidelines fine range. Pfizer HCP and the Department agree that this fine is appropriate given the nature and extent of Pfizer's voluntary, prompt and thorough disclosure of the misconduct at issue, the nature and extent of Pfizer's extensive cooperation in this matter, Pfizer's cooperation, pursuant to USSG § 8C4.1, in the Department's investigation into other misconduct in the industry, and Pfizer's extraordinary and ongoing remediation.

9.   Pfizer HCP agrees to pay a monetary penalty in the amount of $15,000,000 to the U.S. Treasury within ten (10) days of the execution of the Agreement.  The $15,000,000 penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Department that $15,000,000 is the maximum penalty that may be imposed in any future prosecution, and the Department is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Department agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court

imposes as part of a future judgment.  Pfizer HCP acknowledges that no tax deduction

may be sought in connection with the payment of any part of this $15,000,000 penalty.

### Conditional Release from Criminal Liability

10.     In return for the full and truthful cooperation of Pfizer HCP, and its compliance with the

terms and conditions of this Agreement, the Department agrees, subject to Paragraphs 15

to 18 below, not to use any information related to the conduct described in the attached

Statement of Facts against Pfizer HCP in any criminal or civil case, except:  (a) in a

prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false

statement; (c) in a prosecution or other proceeding relating to any crime of violence; or

(d) in a prosecution or other proceeding relating to a violation of any provision of Title 26

of the United States Code.  In addition, the Department agrees, except as provided herein,

that it will not bring any criminal case against Pfizer HCP or any of its wholly owned or

controlled subsidiaries related to the conduct of present and former officers, directors,

employees, agents, consultants, contractors and subcontractors, as described in

Attachment A, or relating to information Pfizer disclosed to the Department prior to the

date on which this Agreement was signed.

    a.     This paragraph does not provide any protection against prosecution for any future

corrupt payments, false books and records, or inadequate internal controls, if any,

made by Pfizer HCP irrespective of whether disclosed by Pfizer HCP pursuant to

the terms of the agreement.

    b.     In addition, this paragraph does not provide any protection against prosecution for

any corrupt payments made in the past that are not described in Attachment A or

that were not disclosed to the Department prior to the effective date of this

Agreement.

c.       In addition, this Paragraph does not provide protection against prosecution of any

present or former officer, director, employee, shareholder, agent, consultant,

contractor, or subcontractor of Pfizer HCP for any violations committed by them.

### Corporate Compliance Program

11.      As indicated in Attachment C, Pfizer HCP's parent company, Pfizer, represents that it has

implemented and will continue to implement a compliance and ethics program designed

to prevent and detect violations of the FCPA, and other applicable anti-corruption laws

throughout its operations, including its agents and business partners (as defined in

Attachment C.1).  Implementation of these policies and procedures shall not be construed

in any future enforcement proceeding as providing immunity or amnesty for any crimes

not disclosed to the Department as of the date of signing of this Agreement for which

Pfizer HCP would otherwise be responsible.

12.      In order to address any deficiencies in its internal controls, policies, and procedures, as

set forth in Attachment C, Pfizer HCP's parent company, Pfizer, represents that it has

undertaken, and will continue to undertake in the future, in a manner consistent with all

of its obligations under this Agreement, reviews of its existing internal controls, policies,

and procedures regarding compliance with the FCPA and other applicable anti-corruption

laws.  Where necessary and appropriate, Pfizer will adopt new or modify existing internal

controls, policies, and procedures in order to ensure that Pfizer and its worldwide

subsidiaries, including Pfizer HCP maintain:  (a) a system of internal accounting controls

designed to ensure the making and keeping of fair and accurate books, records, and

accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures

designed to detect and deter violations of the FCPA and other applicable anti-corruption

laws.  The internal controls system and compliance code, standards, and procedures will

include, but not be limited to, the minimum elements set forth in Attachments C.1 and C.2.

## Corporate Compliance Reporting

13.    As indicated in Attachment C.3, Pfizer HCP's parent company, Pfizer, agrees that it will report to the Department during the term of the Agreement regarding remediation and implementation of certain compliance measures described in Attachments C.1 and C.2.

## Deferred Prosecution

14.    In consideration of: (a) the past and future cooperation of Pfizer HCP and Pfizer as described in Paragraphs 4 and 5 above; (b) Pfizer HCP's payment of a monetary penalty of $15,000,000; (c) Pfizer's and Pfizer HCP's adoption and maintenance of remedial measures, and review and audit of such measures, including the compliance undertakings described in Attachments C.1 and C.2, the Department agrees that any prosecution of Pfizer HCP for the conduct set forth in Attachment A, and for the conduct that Pfizer HCP and Pfizer disclosed to the Department prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

15.    The Department further agrees that if Pfizer HCP fully complies with all of its obligations under this Agreement, the Department will not continue the criminal prosecution against Pfizer HCP described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within thirty (30) days of the Agreement's expiration, the Department shall seek dismissal with prejudice of the criminal Information filed against Pfizer HCP described in Paragraph 1.

## Breach of the Agreement

16.    If, during the Term of this Agreement, the Department determines, in its sole discretion, that Pfizer HCP has: (a) committed any criminal violation of United States law after the

signing of this Agreement; (b) at any time provided deliberately false, incomplete, or misleading information; or (c) otherwise breached the Agreement, Pfizer HCP shall thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge, including the charges in the Information described in Paragraph 1, which may be pursued by the Department in the United States District Court for the District of Columbia.  Any such prosecution may be premised on information provided by Pfizer and Pfizer HCP.  Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Pfizer HCP notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, Pfizer HCP agrees that the statute of limitations with respect to any prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.

17.     In the event that the Department determines that Pfizer HCP has breached this Agreement, the Department agrees to provide Pfizer HCP with written notice of such breach prior to instituting any prosecution resulting from such breach.  Pfizer HCP shall, within thirty (30) days of receipt of such notice, have the opportunity to respond to the Department in writing to explain the nature and circumstances of such breach, as well as the actions Pfizer HCP has taken to address and remediate the situation, which explanation the Department shall consider in determining whether to institute a prosecution.

18.     In the event that the Department determines that Pfizer HCP has breached this Agreement:  (a) all statements made by or on behalf of Pfizer and Pfizer HCP to the Department or to the Court, including the attached Statement of Facts in Attachment A,

and any testimony given by Pfizer and Pfizer HCP before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against Pfizer HCP; and (b) Pfizer HCP shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of Pfizer and Pfizer HCP prior or subsequent to this Agreement, and any leads derived therefrom, should be suppressed. The decision whether conduct or statements of any current director or employee, or any person acting on behalf of, or at the direction of, Pfizer and Pfizer HCP, will be imputed to Pfizer HCP for the purpose of determining whether Pfizer HCP has violated any provision of this Agreement shall be in the sole discretion of the Department.

19.     Pfizer HCP acknowledges that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if Pfizer HCP breaches this Agreement and this matter proceeds to judgment. Pfizer HCP further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Sale or Merger of Pfizer HCP

20.     Pfizer HCP agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a stock or asset sale, merger or transfer, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

### Public Statements by Pfizer HCP

21.     Pfizer HCP expressly agrees that it shall not, through present or future attorneys, officers,

directors, employees, agents or any other person authorized to speak for Pfizer HCP

make any public statement, in litigation or otherwise, contradicting the acceptance of

responsibility by Pfizer HCP set forth above or the facts described in the attached

Statement of Facts in Attachment A.  Any such contradictory statement shall, subject to

cure rights of Pfizer HCP described below, constitute a breach of this Agreement and

Pfizer HCP thereafter shall be subject to prosecution as set forth in Paragraphs 15-18 of

this Agreement.  The decision whether any public statement by any such person

contradicting a fact contained in the Statement of Facts will be imputed to Pfizer HCP for

the purpose of determining whether they have breached this Agreement shall be at the

sole discretion of the Department.  If the Department determines that a public statement

by any such person contradicts in whole or in part a statement contained in the Statement

of Facts, the Department shall so notify Pfizer HCP, and Pfizer HCP may avoid a breach

of this Agreement by publicly repudiating such statement(s) within five (5) business days

after notification.  Consistent with the obligations of Pfizer HCP as set forth above, Pfizer

HCP shall be permitted to raise defenses and to assert affirmative claims in civil and

regulatory proceedings relating to the matters set forth in the Statement of Facts.  This

paragraph does not apply to any statement made by any present or former employee of

Pfizer HCP in the course of any criminal, regulatory, or civil case initiated against such

individual, unless such individual is speaking on behalf of Pfizer HCP.

22.     Pfizer HCP agrees that if it or any of its direct or indirect affiliates or subsidiaries issues a

press release or holds any press conference in connection with this Agreement, Pfizer

HCP shall first consult the Department to determine: (a) whether the text of the release or

proposed statements at the press conference are true and accurate with respect to matters

between the Department and Pfizer HCP; and (b) whether the Department has no

objection to the release.

23. The Department, if requested to do so, agrees to bring to the attention of governmental

and other debarment authorities the facts and circumstances relating to the nature of the

conduct underlying this Agreement, including the nature and quality of Pfizer's and

Pfizer HCP's cooperation and remediation.  By agreeing to provide this information to

debarment authorities, the Department is not agreeing to advocate on behalf of Pfizer and

Pfizer HCP, but rather is agreeing to provide facts to be evaluated independently by the

debarment authorities.

## Limitations on Binding Effect of Agreement

24. This Agreement is binding on Pfizer HCP and the Department but specifically does not

bind any other federal departments, agencies or offices (including any U.S. Attorney's

Offices), or any state, local or foreign law enforcement or regulatory agencies, or any

other authorities, although the Department will bring the cooperation of Pfizer and Pfizer

HCP and its compliance with its other obligations under this Agreement, to the attention

of such agencies and authorities if requested to do so by Pfizer or Pfizer HCP.

## Notice

25. Any notice to the Department under this Agreement shall be given by personal delivery,

overnight delivery by a recognized delivery service, or registered or certified mail,

addressed to the Deputy Chief – Foreign Corrupt Practices Act Unit, Fraud Section,

Criminal Division, U.S. Department of Justice, Fourth Floor, 1400 New York Avenue,

N.W., Washington, D.C. 20005.  Any notice to Pfizer HCP, shall be given by personal

delivery, overnight delivery by a recognized delivery service, or registered or certified

mail, addressed to Bret A. Campbell, counsel to Pfizer HCP, Cadwalader, Wickersham & Taft LLP, 700 Sixth Street, N.W., Washington, DC 20001.  Notice shall be effective upon actual receipt by the Department or Pfizer HCP.

### Complete Agreement

26.      This Agreement sets forth all the terms of the agreement between Pfizer HCP and the Department.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for Pfizer HCP, and a duly authorized representative of Pfizer HCP.


**AGREED:**

**FOR PFIZER H.C.P. CORPORATION:**

Date: _____          By: _____
                               JEFFREY B. CHASNOW
                               President


Date: __8/3/12__          By: _____
                               BRET A. CAMPBELL
                               PETER B. CLARK
                               Cadwalader, Wickersham & Taft LLP
                               Counsel for Pfizer H.C.P. Corporation

**FOR THE DEPARTMENT OF JUSTICE:**

JEFFREY H. KNOX
Principal Deputy Chief, Fraud Section

Date: _8/6/12_

By: _____
NATHANIEL B. EDMONDS
Assistant Chief, FCPA Unit
ANDREW GENTIN
Trial Attorney
United States Department of Justice

Criminal Division
1400 New York Ave., N.W.
Washington, D.C. 20005
(202) 307-0629
nathaniel.edmonds@usdoj.gov

## CORPORATE OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Pfizer H.C.P. Corporation ("Pfizer HCP"). I understand the terms of this Agreement and voluntarily agree, on behalf of Pfizer HCP, to each of its terms. Before signing this Agreement, I consulted outside counsel for Pfizer HCP. Counsel fully advised me of the rights of Pfizer HCP, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of Pfizer HCP. I have advised and caused outside counsel for Pfizer HCP to advise the Board of Directors fully of the rights of Pfizer HCP, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of Pfizer HCP, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am an officer of Pfizer HCP and that I have been duly authorized by Pfizer HCP to execute this Agreement on behalf of Pfizer HCP.

Date: _____, 2012

<div style="margin-left:40%">

Pfizer H.C.P. Corporation

By: _____
JEFFREY B. CHASNOW
President

</div>

## CERTIFICATE OF COUNSEL

I am counsel for Pfizer H.C.P. Corporation ("Pfizer HCP") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Pfizer HCP documents and have discussed the terms of this Agreement with the Pfizer HCP Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of Pfizer HCP has been duly authorized to enter into this Agreement on behalf of Pfizer HCP and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of Pfizer HCP and is a valid and binding obligation of Pfizer HCP. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the President of Pfizer HCP. I have fully advised them of the rights of Pfizer HCP, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of Pfizer HCP to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _8/3/12_

By: _____
BRET A. CAMPBELL
PETER B. CLARK
Cadwalader, Wickersham & Taft LLP
Counsel for Pfizer H.C.P. Corporation

**ATTACHMENT A**

**STATEMENT OF FACTS**

This statement of facts is incorporated by reference as part of the Deferred Prosecution

Agreement (the "DPA") between the United States Department of Justice, Criminal Division,

Fraud Section (the "Department") and Pfizer H.C.P. Corporation ("PFIZER HCP"), and the

parties hereby agree and stipulate that the following information is true and accurate.

Should the Department initiate the prosecution that is deferred by the DPA with PFIZER

HCP, PFIZER HCP agrees that it will neither contest the admissibility of, nor contradict, this

Statement of Facts in any such proceeding.

**BACKGROUND**

*Relevant Entities and Individuals*

1.      PFIZER HCP was an indirect wholly owned subsidiary of Pfizer Inc. ("Pfizer") and was

        incorporated under the laws of the State of New York.  PFIZER HCP was a "domestic

        concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1).  PFIZER HCP's

        indirect parent company, Pfizer, was a global pharmaceutical, animal health, and

        consumer product company headquartered in New York, New York, and incorporated in

        Delaware.  It issued and maintained a class of publicly traded securities registered

        pursuant to Section 12(b) of the Securities Exchange Act, and its common stock traded

        on the New York Stock Exchange under the symbol "PFE." As such, Pfizer was required

        to file periodic reports with the United States Securities and Exchange Commission (the

        "Commission") under Section 13 of the Securities Exchange Act.  Accordingly, Pfizer

        was an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a).  During the

        relevant period, PFIZER HCP operated in several international markets through

representative offices, including offices in Bulgaria, Croatia, and Kazakhstan, as well as through contracts with Russian distributors and employees of a representative office of PFIZER HCP's parent company in Moscow ("Pfizer Russia").  The books and records of PFIZER HCP, which included revenues from the aforementioned countries, were consolidated into the books and records of Pfizer for the purposes of preparing Pfizer's year-end financial statements, which were filed with the Commission in Washington, D.C.

2.  On April 16, 2003, Pfizer acquired Pharmacia Corporation ("Pharmacia") in a stock-for-stock transaction.  Pharmacia's international operations were combined with Pfizer's, including Pharmacia's operations in Bulgaria, Croatia, Kazakhstan and Russia which were thereafter restructured and incorporated into PFIZER HCP.  Prior to the 2003 merger, Pharmacia operated in the Republic of Croatia as a representative office of Pharmacia & Upjohn S.p.A., an Italian company, and later as a representative office of Pharmacia Enterprises Luxembourg SARL (collectively "Pharmacia Croatia").

3.  Croatian Official, a citizen of the Republic of Croatia, held official positions on government committees in Croatia and had influence over decisions concerning the registration and reimbursement of Pfizer products marketed and sold in the country.  Croatian Official was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

4.  Kazakh Company was a Kazakh company that contracted with PFIZER HCP to provide distribution services and related services in the Republic of Kazakhstan.  In light of the foregoing, Kazakh Company was an "agent of a domestic concern," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

5.  Russian Official 1, a citizen of the Russian Federation, was a medical doctor, employed by a public hospital, and had influence over the Russian government's purchase and prescription of Pfizer products marketed and sold in the country.  Russian Official 1 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

6.  Russian Official 2, a citizen of the Russian Federation, was a high-ranking government official, who held official positions on government committees in Russia, and had influence over decisions concerning the reimbursement of Pfizer products marketed and sold in the country.  Russian Official 2 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

7.  Russian Official 3, a citizen of the Russian Federation, had influence over decisions concerning treatment algorithms that could include Pfizer products marketed and sold in the country.  Russian Official 3 was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

8.  Russian Company 1 was a Russian company that bid on tenders issued by Russian healthcare institutions and worked with PFIZER HCP and Pfizer Russia to fill tenders using Pfizer products.  In light of the foregoing, Russian Company 1 was an "agent of a domestic concern," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

9.  Russian Company 2 was a Russian company that provided certain services to PFIZER HCP and Pfizer Russia, including making improper payments to Russian government officials and other companies on PFIZER HCP's behalf, in order to conceal the payments.  In light of the foregoing, Russian Company 2 was an "agent of a domestic concern," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

*Origin of the Investigation and*
*Cooperation with the Authorities*

10.    In May 2004, Pfizer's Corporate Compliance Division learned of potentially improper

payments by the Croatian representative office of PFIZER HCP ("Pfizer HCP Croatia").

After conducting a preliminary investigation using external counsel, Pfizer made a

voluntary disclosure to the Department and to the Commission.   At the time, neither

agency was aware of the allegations of improper payments or had any open investigation

involving the overseas operations of Pfizer or any of its subsidiaries.

11.    From 2004 to the present, Pfizer, using external counsel and forensic accountants,

internal Legal, Compliance, and Corporate Audit personnel, conducted an extensive,

global review of its operations regarding allegations of improper payments to government

officials and government doctors, including in PFIZER HCP markets and those of other

Pfizer subsidiaries.  This included a review of allegations that were identified by Pfizer's

own internal investigations and compliance controls, including its system of proactive

FCPA reviews and enhanced audits.  Pfizer reported to the Department and the

Commission on the results of these investigations on a regular basis.

12.    At the request of the Department and the Commission, Pfizer agreed to periodically toll

the statute of limitations on its own behalf and on behalf of its subsidiaries.

13.    In addition, starting immediately in 2004, Pfizer launched extensive remedial actions

including: undertaking a comprehensive review of its compliance program, implementing

enhanced anti-corruption compliance policies and procedures on a worldwide basis,

developing global systems to support employee compliance with the enhanced

procedures, adding FCPA-specific reviews to its internal audits, performing proactive

anti-corruption compliance reviews in approximately ten markets annually, and

conducting comprehensive anti-corruption training throughout the organization. Pfizer regularly reported to the Department and the Commission on these activities and sought their input concerning the scope and focus of these remedial activities.

*Background on International Pharmaceutical Sales*

14. The manufacture, registration, distribution, sale, and prescription of pharmaceuticals were highly-regulated activities throughout the world. While there were multinational regulatory schemes, it was typical that each country established its own regulatory structure at a local, regional, and/or national level. These regulatory structures generally required the registration of pharmaceuticals and regulated labeling and advertising. Additionally, in certain countries the government established lists of pharmaceuticals that were approved for government reimbursement or otherwise determined those pharmaceuticals that might be purchased by government institutions. Moreover, countries often regulated the interactions between pharmaceutical companies and hospitals, pharmacies, and healthcare professionals.

15. In those countries with national healthcare systems, hospitals, clinics, and pharmacies were generally agencies or instrumentalities of foreign governments, and, thus, many of the healthcare professionals employed by these agencies and instrumentalities were foreign officials within the meaning of the FCPA.

16. During the relevant period, for the purpose of improperly influencing foreign officials in connection with regulatory and formulary approvals, purchase decisions, prescription decisions, and customs clearance, employees or agents of PFIZER HCP and Pfizer Russia made and authorized the making of payments of cash and the provision of other things of value both directly and through third parties. Funds for these payments were often

generated by the employees or agents of PFIZER HCP and Pfizer Russia through the use of collusive vendors to create fraudulent invoices.

## EXAMPLES OF IMPROPER PAYMENTS
### TO CORRUPT GOVERNMENT OFFICIALS

17. The facts identified in the following paragraphs are representative of the types of the improper payments made by employees or agents of PFIZER HCP to corrupt government officials. As a result of corrupt payments, PFIZER HCP earned more than $7,000,000.

### *BULGARIA*

*Improper Payments for Travel to Influence the Sales of Pharmaceuticals*

18. PFIZER HCP's representative office in Bulgaria ("Pfizer HCP Bulgaria") used improper travel to corruptly influence sales of pharmaceutical products.

19. For example, Pfizer HCP Bulgaria created a program of promotional meetings known as "Incentive Trips" that were intended to reward Pfizer HCP Bulgaria sales representatives for achieving their sales goals by permitting the sales representatives to invite three or four government doctors as guests. On January 24, 2003, a Pfizer HCP Bulgaria district manager sent an electronic message to four sales representatives that discussed marketing programs and "various possibilities to stimulate the prescribers." The district manager instructed the sales representatives to "put to each individual doctor a specific target as to how many packs (or new patients) per month he should achieve" and then to decide which doctors would be "stimulated" through promotions such as the incentive trips. Pfizer HCP Bulgaria incurred expenses totaling over $28,000 in connection with Incentive Trips to tourist destinations in Greece.

20. Similarly, Pfizer HCP Bulgaria employees offered to provide support to Bulgarian government doctors to attend medical conferences and other educational events in return

for agreements to prescribe Pfizer pharmaceutical products.   Pfizer HCP Bulgaria incurred expenses of over $17,000 in connection with these agreements.  For example, on October 14, 2003, a Pfizer HCP Bulgaria sales department manager sent an electronic message to multiple sales representatives containing instructions for submitting sponsorship requests and explained how "commitments" to a certain level of prescription must be made before Pfizer HCP Bulgaria would sponsor the doctors, including government doctors.  The manager wrote: "[e]ach representative wanting to sponsor someone . . . must very precisely state the grounds for recommending the sponsorship, and also what the doctor in question is expected to do or has already done (which is the better option).  'Greenfield' investment is not to be preferred, because in many cases promises are not fulfilled. . . .   If you are given approval, please state the exact commitments the doctor has made or performed when filling the form."

### *CROATIA*

*Consulting Agreements Used to Secure Regulatory*
*Approvals and Increase Pharmaceutical Sales*

21.   Pharmacia Croatia, and later Pfizer HCP Croatia, used "consulting agreements" to corruptly influence the sales of pharmaceutical products, including the registration of pharmaceutical products or their inclusion on reimbursement lists, by making improper payments to a doctor involved in government committees that regulated pharmaceutical sales in Croatia.

22.   For example, on or about February 1, 1997, Pharmacia Croatia executed a purported "Consulting Agreement" with Croatian Official, who was a prominent Croatian doctor and also a professor of internal medicine at a government funded university.  Croatian Official also held official positions on government committees in Croatia, and had

influence over decisions concerning the registration and reimbursement of Pfizer products marketed and sold in the country. In return for monthly payments, which were paid to an Austrian bank account held in Croatian Official's name, the doctor was obligated to "provide medical and thereto related regulatory consultancy services to Pharmacia & Upjohn, as requested by Pharmacia & Upjohn. . . . "

23.  On or about April 10, 1997, the Pharmacia Croatia General Manager explained the purpose of the Consulting Agreement: "as [Croatian Official] is a member of the Registration Committee regarding pharmaceuticals, I do expect that all products which are to be registered, will pass the regular procedure by his assistance."

24.  From in or around February 1997 to May 2003, Croatian Official submitted monthly invoices, which failed to indicate the nature of the services, requesting compensation for services provided under the Consulting Agreement.

25.  During the period in which he received payments from Pharmacia Croatia pursuant to the Consulting Agreement, Croatian Official held multiple positions within Croatian government agencies that regulated the pharmaceutical industry. During this time period, Croatian Official was a member of committees that determined which pharmaceutical products could be registered and sold in Croatia, as well as which products would be reimbursed under the country's national health insurance system and at what price they would be reimbursed. During the period Croatian Official received payments, at least twelve Pharmacia and Pfizer pharmaceutical products were approved for sale by those committees, and at least thirteen Pharmacia and/or Pfizer pharmaceutical products were approved for reimbursement by the national health insurance program. After the Pharmacia merger in March 2003, Pfizer HCP Croatia continued making payments to

Croatian Official for a limited time, during which period Pfizer HCP Croatia believed that three Pfizer products were approved with the assistance of the doctor.

*Bonuses Paid to Increase Pharmaceutical Sales*

26.     Pharmacia Croatia, and later Pfizer HCP Croatia, made payments described as "hospital bonuses" or "verbal bonuses" to corruptly influence the sales of pharmaceutical products and the inclusion of pharmaceutical products in tenders or on formulary lists.

27.     Pharmacia Croatia entered into oral agreements with government officials at Croatian government hospitals to provide "bonuses" that were calculated as a percentage of the amount of certain Pharmacia pharmaceutical products.   In return, the government officials would agree to direct the purchasing of Pharmacia products, and later Pfizer products, by their institutions.  Bonuses were provided by Pharmacia Croatia and Pfizer HCP Croatia in the form of support for international travel, purchases of equipment, free pharmaceutical products as well as cash payments, travel expenses for attending medical conferences, and lecture fees.  The benefits were provided at times directly for the benefit of the doctor, and at times for the benefit of the hospital.

28.     On or about February 18, 2004, a Pfizer HCP Croatia sales representative drafted a memorandum reporting on her discussions with doctors at Croatian public hospitals regarding bonus agreements for purchases of a Pfizer product, which reflected an agreement with the chief doctor who promised purchases of the Pfizer product in exchange for PFIZER HCP providing various things of value, including travel benefits and bonuses based on a percentage of sales.

### *KAZAKHSTAN*

*Distribution Agreements*
*Used to Secure Registration Approval*

29.    PFIZER HCP's representative office in Kazakhstan ("Pfizer HCP Kazakhstan") granted a distributorship to Kazakh Company, a company believed to be affiliated with senior Kazakh government officials, in order to corruptly obtain approval for the registration of a Pfizer product in Kazakhstan.

30.    On or about May 5, 2000, Pfizer HCP Kazakhstan entered into an exclusive distribution contract for a Pfizer product with Kazakh Company that was valued at a minimum of $500,000 believing that all or part of the value of the contract would be provided to a high-level Kazakh government official.

31.    On or about September 23, 2003, a regional supervisor with responsibility for Pfizer HCP Kazakhstan sent a memoranda to his supervisor memorializing a conversation held in Kazakhstan, in which he indicated that the controller of Kazakh Company was "very close to government officials," and that Kazakh Company was likely responsible for Pfizer HCP Kazakhstan's past problems with the registration of a Pfizer product in Kazakhstan.

### *RUSSIA*

*Improper Payments for Travel to Corruptly*
*Influence the Sales of Pharmaceuticals*

32.    Pfizer Russia intended to use conference attendance and travel as a corrupt inducement for healthcare providers to prescribe or purchase Pfizer products.

33.    For example, on or about September 8, 2003, a Pfizer Russia employee emailed colleagues that Russian Official 1 requested funds to attend a conference and "has

pledged to prescribe at least 20 packs of [a Pfizer product] per month, and 20 [] packs [of another Pfizer product]."

34.  Similarly, in an email dated June 27, 2005, a Pfizer Russia employee emailed that a government doctor "should be assigned the task of stretching the amount of the purchases . . . to US $100 thousand" as an "obligation" in exchange for a trip to a conference in the Netherlands or Germany.

35.  On or about September 14, 2005, a Pfizer Russia employee emailed that an "agreement on cooperation" had been reached with a government doctor, and that Pfizer Russia's requirements were the "purchase quantities," and the doctor's requirement was "a trip to a conference."

*Improper Sales and Marketing Practices*
*The "Hospital Program"*

36.  Pfizer Russia used purported sales initiatives as a corrupt inducement for healthcare providers to prescribe or purchase Pfizer products.  Pfizer Russia instituted a sales initiative referred to as the "Hospital Program" in which Pfizer Russia employees were allowed to provide incentives that were calculated as 5% of the value of certain Pfizer products purchased by the hospitals.

37.  On its face, the Hospital Program appeared to be a mechanism for Pfizer Russia to provide the equivalent of indirect price discounts or in-kind benefits to government hospitals in connection with their purchases of Pfizer products.  In practice, however, Pfizer Russia used the Hospital Program to make cash payments to individual government healthcare professionals to corruptly reward past purchases and prescriptions of Pfizer products, and to corruptly induce future purchases and prescriptions.

38.     Pfizer Russia employees obtained cash for the Hospital Program incentive payments with the assistance of collusive vendors.  The vendors would provide cash to the employees after receiving payment from Pfizer Russia on the basis of false invoices submitted by the vendors.  Pfizer Russia employees used the cash to make payments to doctors to reward past sales and induce future sales.  For example, on or about June 9, 2005, a Pfizer Russia employee sent an email to her supervisor stating that a cash payment had been made to an individual government doctor, which represented 5% of the value of the purchases of a Pfizer product made by a certain government hospital during March 2005.

39.     In addition to delivering the incentive cash payments directly to the doctors, Pfizer Russia also used intermediary companies to make Hospital Program payments.  In some cases the intermediary companies were identified by the recipient doctors and administrators, and in some cases they were selected by Pfizer Russia employees.

40.     Pfizer Russia also used the Hospital Program to make donations of goods or sponsorship aid to government hospitals, but Pfizer Russia did not require an accounting of whether the donations of goods or sponsorship aid were actually used by the government hospitals or if they were used personally by government officials.

41.     The Finance Director of Pfizer Russia established two Hospital Program account codes in the company's General Ledger and instructed employees to book to this account all their Hospital Program payments and transactions, including improper payments.  From in or around 2003 through in or around 2005, Pfizer Russia booked approximately $820,000 in transactions to the two Hospital Program account codes.

*Improper Payments for Travel Linked to*
*Formulary Approvals and Government Recommendations*

42.  Pfizer Russia intended to use conference attendance and travel to corruptly influence the inclusion of Pfizer products in tenders or on formulary lists.

43.  For example, on or about November 19, 2003, in an invoice cover letter, a Pfizer Russia employee requested "payment for the (motivational) trip of [Russian Official 2] for the inclusion of [a Pfizer product] into the list . . . of medications refundable by the state" in order to influence Russian Official 2 to add [the Pfizer product] to the regional formulary list.

44.  Similarly, on or about December 2, 2004, a Pfizer Russia employee requested sponsorship for a local department of health employee who was assisting the chief pharmacologist of a regional pediatric hospital, Russian Official 3, who was compiling algorithms for antibiotic therapy and wanted "to be financially compensated" for this work. The Pfizer Russia employee noted that, "in return for this," the pharmacologist "will include our products in the treatment algorithms." The treatment algorithms by Russian Official 3 constituted the official government-recommended treatment.

*Improper Sales and Marketing Practices*
*Use of Intermediary Companies*

45.  Pfizer Russia also used third party intermediaries to make improper payments related to corruptly increasing the sales of pharmaceuticals. This practice was approved by senior leadership in Pfizer Russia, including the Country Manager and the Finance Director. According to Pfizer Russia employees, it was common in Russia for government officials to use third party companies to receive the improper payments. As a result, many transactions involved four companies: the company, the government official, and their respective intermediary companies.

46.    For example, on or about April 7, 2004, a Pfizer Russia employee requested that a payment be made to a public official "who took an active part in getting [a Pfizer product] into the bidding." This request was supported by two invoice cover letters identifying "payment for the service of [], an employee of the State Department of [] Healthcare for the purchase of [a Pfizer product]" and a "hospital program for purchase of [a Pfizer product] . . . to civil servant [] of health service." The payments, however, were directed to an intermediary company used by Pfizer Russia to make improper payments to public officials.

47.    Similarly, on or about April 7, 2004, a Pfizer Russia employee requested payment of an "honorarium" to a Russian government official "for including [two Pfizer products] in the list of preferential drugs," on a formulary listing, but directed the payment through an intermediary company. The invoice falsely stated that the payment to the intermediary company was for "organization of a conference."

48.    On or about July 26, 2004, a Pfizer Russia employee sent an email to his supervisors stating that Russia Company 1 had won a tender that included a Pfizer product, and that Russian Company 1's costs included "10% - Motivation of Officials."

49.    In or around October 2005 through on or about December 8, 2005, Pfizer Russia caused payments totaling at least $69,000 to be made to Russian Company 2 with the understanding that the payments would be provided to individual Russian doctors employed in public hospitals, and that the payments represented 5% of the value of the purchases of Pfizer products in the doctors' respective government hospitals.

50.    In or around October 2005, Pfizer Russia employees discussed how a regional distributor would identify for Pfizer Russia companies having "neutral names," to which Pfizer

Russia could make improper payments for the benefit of doctors, and which would be booked inaccurately as conference support.

51. In addition, Pfizer Russia made suspicious and improper payments totaling approximately $700,000 to companies that appeared to be intermediaries in connection with corrupt transactions relating to: hospital incentive programs, travel and pharmaceutical congresses, third party vendors, an honorarium for a formulary committee member, distributor reimbursement, and expenses for staging a government conference.

## ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Pfizer H.C.P. Corporation ("Pfizer HCP" or the "Company") has been

engaged in discussions with the United States Department of Justice, Criminal Division, Fraud

Section (the "Department") regarding issues arising in relation to certain improper payments to

foreign officials to assist in obtaining business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter

into a certain agreement with the Department; and

WHEREAS, the appropriate officer of Pfizer HCP, Jeffrey B. Chasnow, together with

outside counsel for the Company, have advised the Board of Directors of the Company of its

rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of

entering into such agreement with the Department;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) acknowledges the filing of the two-count Information

charging Pfizer HCP with a conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"),

Title 15, United States Code, Sections 78dd-2 and 78m(b)(2)(A), and a violation of the anti-

bribery provisions, Title 15 U.S.C. Sections 78dd-2(a) and 78dd-2(i)(1); (b) waives indictment

on such charges and enters into a deferred prosecution agreement with the Department; and

(c) agrees to accept monetary criminal penalties against Pfizer HCP totaling $15,000,000, and to

pay a total of $15,000,000 to the United States Treasury with respect to the conduct described in

the Information;

2.      The President of Pfizer HCP, Jeffrey B. Chasnow, is hereby authorized,

empowered and directed, on behalf of the Company, to execute the Deferred Prosecution

Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the President of Pfizer HCP, Jeffrey B. Chasnow, may approve;

3.    The President of Pfizer HCP, Jeffrey B. Chasnow, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.    All of the actions of the President of Pfizer HCP, Jeffrey B. Chasnow, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: Aug 2 , 2012

SUSAN GRANT
Corporate Secretary
Pfizer H.C.P. Corporation

## ATTACHMENT C

## COMPLIANCE COMMITMENTS

In conjunction with the Deferred Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Department") and Pfizer H.C.P. Corporation dated  8/7/12 (the "Pfizer HCP DPA"), Pfizer Inc. ("Pfizer") enters into the following agreement with the Department to undertake certain compliance measures for Pfizer and all of its subsidiaries and operating companies worldwide.

Pfizer will maintain or, as necessary, strengthen its compliance, bookkeeping, and internal controls standards and procedures, as set forth in Attachments C.1 and C.2. In addition, Pfizer will report to the Department the status of Pfizer's remediation and implementation of compliance measures, as set forth in Attachment C.3.

If the Department in its sole discretion determines that Pfizer has not fulfilled the commitments outlined in Attachments C.1, C.2 and C.3, any such failure may be considered, in the sole discretion of the Department, to be a breach of the Pfizer HCP DPA, as contemplated in Paragraph 16(c) of the Pfizer HCP DPA.

## ATTACHMENT C.1

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, and other applicable anti-corruption laws, Pfizer Inc. and its subsidiaries and operating companies (collectively, "Pfizer") agree to continue to conduct appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, Pfizer agrees to adopt new or to modify existing internal controls, policies, and procedures in order to ensure that it maintains:  (a) a system of internal accounting controls designed to ensure that Pfizer makes and keeps fair and accurate books, records, and accounts; and (b) rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements:

1.      A clearly articulated corporate policy against violations of the FCPA, including its anti-bribery, books and records, and internal controls provisions, and other applicable counterparts (collectively, the "anti-corruption laws");

2.      Promulgation of compliance standards and procedures designed to reduce the prospect of violations of the anti-corruption laws and Pfizer's compliance code.  These standards and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties while acting on behalf of Pfizer in a foreign jurisdiction, including but not limited to, agents, consultants, representatives, distributors, teaming partners, and joint venture partners (collectively, "agents and business partners");

3.      The assignment of responsibility to one or more senior corporate executives of Pfizer for the implementation and oversight of compliance with policies, standards, and procedures regarding the anti-corruption laws.  Such corporate official(s) shall have the authority to report matters directly to Pfizer's Board of Directors or any appropriate committee of the Board of Directors;

4.      Mechanisms designed to ensure that the policies, standards, and procedures of Pfizer regarding the anti-corruption laws are effectively communicated to all directors, officers, employees, and, where appropriate, agents and business partners.  These mechanisms shall include:  (a) periodic training for all directors, officers, and employees, and, where necessary and appropriate, agents and business partners; and (b) accompanying certifications by all such directors, officers, and employees, and, where necessary and appropriate, agents, and business partners, certifying compliance with the training requirements;

5.      An effective system for reporting suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the anti-corruption laws for directors, officers, employees, and, where necessary and appropriate, agents and business partners;

6.      Appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and Pfizer's compliance code by Pfizer's directors, officers, and employees;

7.      Appropriate due diligence requirements pertaining to the retention and oversight of agents and business partners;

8.      Standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption

representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of anti-corruption laws, and regulations or representations and undertakings related to such matters; and

        9.     Periodic testing of the compliance code, standards, and procedures designed to evaluate their effectiveness in detecting and reducing violations of anti-corruption laws and Pfizer's compliance code.

## ATTACHMENT C.2

## PFIZER'S ENHANCED COMPLIANCE OBLIGATIONS

In addition to and building upon the commitments enumerated in Attachment C.1, Pfizer Inc. and its subsidiaries and operating companies (collectively, "Pfizer") agree that they have taken or will undertake the following, at a minimum, for the duration of the Deferred Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Department") and Pfizer H.C.P. Corporation dated 8/7/12.

### *General*

1.     Pfizer will:

     a.     Maintain the appointment of a senior corporate executive with significant experience with compliance with the FCPA, including its anti-bribery, books and records, and internal controls provisions, as well as other applicable anti-corruption laws and regulations (hereinafter "anti-corruption laws and regulations") to serve as Chief Compliance and Risk Officer.  The Chief Compliance and Risk Officer will have reporting obligations directly to the Chief Executive Officer and periodic reporting obligations to the Audit Committee of the Board of Directors.

     b.     Maintain the appointment of heads of compliance with responsibility for each of its business units ("BU Compliance Leads") who have reporting obligations through the Chief Compliance and Risk Officer or General Counsel.

     c.     Establish and maintain an "Executive Compliance Committee" to oversee Pfizer's corporate compliance program with respect to both the laws and regulations applicable to Pfizer's business and to Pfizer's Code of Conduct and related

policies.  The Executive Compliance Committee is chaired by the Chief Executive Officer, and includes appropriate senior leaders, such as the Chief Financial Officer, the General Counsel and senior leaders from compliance, finance, audit, human resources and Pfizer's business units.

2.     Pfizer has and will maintain gifts, hospitality, and travel policies and procedures in each jurisdiction that are appropriately designed to prevent violations of the anti-corruption laws and regulations.  Specifically, Pfizer has implemented and will maintain the following enhanced anti-corruption policies and procedures:

     a.     A Global Anti-Bribery and Anti-Corruption Corporate Policy and an International Anti-Bribery and Anti-Corruption Procedure (the "FCPA Procedure"), which are supported by implementing standard operating procedures by market, region or function as appropriate, and which provide detailed procedures for employees to follow when interacting with foreign government officials and conducting FCPA due diligence on consultants, technical advisors, researchers and grant recipients and, where appropriate, in commercial transactions with "agents and business partners" (as defined in Attachment C.1).  The FCPA Procedure establishes procedures and specific limits governing the provision by Pfizer's employees of gifts, hospitality, international travel and site visits, meeting support, educational grants, charitable donations, and consulting fees, speaker fees, honoraria, and the like to foreign government officials.  All of these procedures are in the local language when appropriate.

     b.     A Global Policy on Interactions with Healthcare Professionals which is supported by implementing standard operating procedures by market, region or function, as appropriate, establishing ethical standards and procedures for Pfizer employees to

follow when interacting with physicians, nurses, and other such human healthcare professionals, including standards related to product samples, support for conferences, and practice-related items.

c.    At a minimum, these policies and procedures shall contain the following restrictions regarding foreign government officials, including but not limited to public health care providers, administrators, and regulators:

    i.    Gifts must be modest in value, appropriate under the circumstances, and given in accordance with anti-corruption laws and regulations, including those of the government official's home country;

    ii.    Hospitality shall be limited to reasonably priced meals, accommodations, and incidental expenses that are part of product education and training programs, professional training, and conferences or business meetings;

    iii.    Travel shall be limited to product education and training programs, professional training and education, and conferences or business meetings; and

    iv.    Gifts, hospitality, and travel shall not include expenses for anyone other than the relevant officials, unless different standards are required by local law or regulation.

### *Complaints, Reports, and Compliance Issues*

3.    Pfizer has committed and will continue the commitment of significantly enhanced resources for the international functions of the Compliance Division that have reporting obligations through the Chief Compliance and Risk Officer or General Counsel, including the following:

a.    An international investigations group charged with responding to and investigating anti-corruption compliance issues reported on a global basis and ensuring that appropriate remedial measures are undertaken after the completion of an investigation;

b.    An anti-corruption program office providing centralized assistance and guidance regarding the implementation, updating and revising of the FCPA Procedure, the establishment of systems to enhance compliance with the FCPA Procedure, and the administration of corporate-level training and annual anti-corruption certifications; and

c.    A mergers and acquisitions compliance function designed to support early identification of compliance risks associated with complex business transactions and to ensure the integration of Pfizer's compliance procedures into newly acquired entities.

4.    Pfizer shall maintain its mechanisms for making and handling reports and complaints related to potential violations of anti-corruption laws and regulations, including, when appropriate, referral for review and response by internal audit, finance, legal, compliance and other personnel as appropriate, and will ensure that reasonable access is provided to an anonymous, toll-free hotline as well as to an anonymous electronic complaint form, where anonymous reporting is legally permissible.

5.    Pfizer, through its Executive Compliance Committee, will ensure that the Compliance and Legal Divisions review and respond to FCPA and corruption issues promptly and consistently.

*Risk Assessments and Proactive Reviews*

6.    Pfizer has conducted and will continue to conduct a risk-based program of annual

proactive anti-corruption reviews of high-risk markets.  These FCPA proactive reviews

are designed to identify anti-corruption compliance issues, examine compliance

procedures and controls as implemented in the field and identify best practices to be

implemented in additional markets.  On the basis of those assessments, as needed, Pfizer

will modify compliance implementation to minimize risks observed through the FCPA

proactive review process.

7.    Specifically, Pfizer will identify markets which are at high risk for corruption because of

their business and location, and will select at least five of those markets to receive FCPA

proactive reviews during that year.  High risk markets shall be identified based on

Pfizer's risk assessment process in consultation with the Chief Compliance and Risk

Officer, taking into account multiple risk factors including, but not limited to:  a high

degree of interaction with foreign government officials; the existence of internal reports

of potential corruption risk; a high corruption risk based on certain corruption indexes;

and financial audit results.  Each FCPA proactive review shall include, at a minimum:

a.    On-site visits by an FCPA review team comprised of qualified personnel from the

Compliance and, when appropriate, Legal Divisions who have received FCPA

and anti-corruption training;

b.    Where appropriate, participation in the on-site visits by qualified auditors;

c.    Review of a representative sample, appropriately adjusted for the risks of the

market, of contracts with and payments to individual foreign government officials

or health care providers, as well as other high-risk transactions in the market;

d.     Creation of action plans resulting from issues identified during FCPA proactive reviews; these action plans will be shared with appropriate senior management, including when appropriate the Chief Compliance and Risk Officer, and will contain mandatory remedial steps designed to enhance anti-corruption compliance, repair process weaknesses, and deter violations; and

e.     Where appropriate, feasible, and permissible under local law, review of the books and records of a sample of distributors which, in the view of the FCPA proactive review team, may present corruption risk.

8.     Pfizer has implemented and will continue to implement an FCPA trend analysis that requires various operational functions to track and review certain categories of interactions with foreign government officials and due diligence on agents and business partners.

## *Acquisitions*

9.     Pfizer has ensured and will continue to ensure that, when practicable and appropriate on the basis of a FCPA risk assessment, new business entities are only acquired after thorough risk-based FCPA and anti-corruption due diligence was conducted by a suitable combination of legal, accounting, and compliance personnel.  When such anti-corruption due diligence is appropriate but not practicable prior to acquisition of a new business for reasons beyond Pfizer's control, or due to any applicable law, rule, or regulation, Pfizer has conducted and will conduct anti-corruption due diligence subsequent to the acquisition and report to the Department any corrupt payments or falsified books and records as required by Attachment C.3.

10.     Pfizer will ensure that Pfizer's policies, standards and procedures regarding anti-
        corruption laws and regulations apply as quickly as is practicable, but in any event no
        more than one year post-closing, to newly-acquired businesses, and will promptly:

        a.      Train directors, officers, and senior managers, and those employees working in
                positions involving activities covered by Pfizer's policies regarding
                anti-corruption and compliance with the FCPA, and, where necessary and
                appropriate, agents and business partners; and

        b.      Include all newly-acquired businesses in Pfizer's regular anti-corruption auditing
                schedule.

### *Relationships with Third Parties*

11.     When appropriate on the basis of a FCPA risk assessment, Pfizer will conduct risk-based
        due diligence of sales intermediaries, including agents, consultants, representatives,
        distributors, and joint venture partners.  Such due diligence will be conducted prior to the
        retention of any new agent, consultant, representative, distributor, or joint venture partner
        and for all such sales intermediaries will be updated no less than once every three years.
        At a minimum, such due diligence shall include:

        a.      A review of the qualifications and business reputation of the sales intermediaries;

        b.      A rationale for the use of the sales intermediary; and

        c.      A review of relevant FCPA risk areas.

12.     Where due diligence of a sales intermediary raises a serious red flag, the relevant
        information shall be reviewed by personnel from the compliance or legal divisions who
        have received FCPA and anti-corruption training.

13.     Where necessary and appropriate and where permitted by applicable law, Pfizer has
        included and will include standard provisions designed to prevent violations of the FCPA

and other applicable anti-corruption laws and regulations in agreements, contracts, and renewals thereof with agents and business partners, including:

   a.   Anti-corruption representations and undertakings relating to compliance with the anti-corruption laws and regulations;

   b.   Rights to conduct audits of the books and records of the agent or business partner that are related to their business with Pfizer; and

   c.   Rights to terminate the agent or business partner as a result of any breach of anti-corruption laws and regulations or representations and undertakings related to such anti-corruption laws and regulations.

### *Training*

14.   Pfizer has provided and shall provide:

   a.   Biennial training on anti-corruption laws and regulations to directors, officers, executives, and employees working in positions involving activities covered by Pfizer's policies regarding anti-corruption and compliance with the FCPA;

   b.   Enhanced FCPA training for all internal audit, financial, compliance and legal personnel involved in FCPA proactive reviews or anti-corruption due diligence related to the potential acquisition of new businesses, if not already qualified and experienced; and

   c.   When appropriate on the basis of a FCPA risk assessment, provide FCPA and anti-corruption training to relevant agents and business partners, at least once every three years.

15.   Pfizer has implemented and shall maintain a system of annual certifications from senior managers in each of Pfizer's Business Units, Divisions, and operational functions (at the market or regional level, or the reasonable equivalent) as appropriate, confirming that

their standard operating procedures adequately implement Pfizer's anti-corruption

policies, procedures and controls, including training requirements, that they have

reviewed and followed up on any issues identified in FCPA trend analyses, and that they

are not aware of any FCPA or other corruption issues that have not already been reported

to the Compliance Division or the Legal Division.

**ATTACHMENT C.3**

**CORPORATE COMPLIANCE REPORTING**

Pfizer Inc. ("Pfizer") agrees to periodically, at no more than 9-month intervals during the term of the Deferred Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Department") and Pfizer H.C.P. Corporation dated 8/7/12 (the "Pfizer HCP DPA"), report to the Department the status of Pfizer's remediation and implementation of compliance measures described in Attachments C.1 and C.2.

During the term of the Pfizer HCP DPA, should Pfizer discover credible evidence, not already reported to the Department, that questionable or corrupt payments or questionable or corrupt transfers of property or interests may have been offered, promised, paid, or authorized by any Pfizer entity or person, or any entity or person while working directly for Pfizer, or that related false books and records have been maintained, Pfizer shall report such conduct to the Department in the course of periodic communication to be scheduled between Pfizer and the Department. The first such update shall take place within 60 days after the entry of the Pfizer HCP DPA.

During the term of the Pfizer HCP DPA, Pfizer shall:  (1) conduct an initial review and submit an initial report, and (2) conduct and prepare two follow-up reviews and reports, as described below:

1.      Pfizer shall submit to the Department a written report within 180 calendar days of the entry of the Pfizer HCP DPA setting forth a complete description of its FCPA and anti-corruption related remediation efforts to date, its proposals reasonably designed to improve the policies and procedures of Pfizer for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the parameters of the subsequent reviews

(the "Initial Report").  The Initial Report shall be transmitted to Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Washington, D.C. 20005.  Pfizer may extend the time period for issuance of the Initial Report with prior written approval of the Department.

2.      Pfizer shall undertake two follow-up reviews to the Initial Report, incorporating any comments provided by the Department on the Initial Report, to further monitor and assess whether the policies and procedures of Pfizer are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

3.      The first follow-up review and report shall be completed by no later than 270 days after the Initial Report.  The second follow-up review and report shall be completed by no later than 270 days after the completion of the first follow-up review and report, but not more than two years and seven days after the entry of the Pfizer HCP DPA.  Pfizer may extend the time period for issuance of the follow-up reports with prior written approval of the Department.

**ATTACHMENT C.4**

**COMPLIANCE AGREEMENT BY PFIZER INC.**

Pfizer Inc. agrees to fulfill the commitments outlined in Attachment C.1, C.2 and C.3 of

the Deferred Prosecution Agreement between the United States Department of Justice, Criminal

Division, Fraud Section and Pfizer H.C.P. Corporation dated 8/7/12

AGREED AND CONSENTED TO:

For Pfizer Inc.

By: _____
AMY W. SCHULMAN
Executive Vice President and General
Counsel

APPROVED:

By: _____
BRET A. CAMPBELL
PETER B. CLARK
Attorneys for Pfizer Inc.